UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. C-09-557-1 |
| | § | |
| ANTHONY GILBERT MARTINEZ JR | § | |

## ORDER DENYING MOTION TO SUPPRESS

On this day came on to be considered Defendant Anthony Gilbert Martinez Jr.'s Motion to Suppress Illegally Obtained Evidence in the above-styled criminal action. (D.E. 19.) The Court held a hearing on Defendant's Motion to Suppress on September 18, 2009. For the reasons set forth below and for the reasons discussed at the September 18 hearing, Defendant's Motion to Suppress is hereby DENIED.

**I.    Factual Background**

At 12:07 AM on March 12, 2009, the Corpus Christi Police Emergency Dispatcher received the first of several calls regarding gunshots in the Flour Bluff area of Corpus Christi, Texas.[1] The first caller reported hearing approximately 24 gunshots. The dispatcher immediately assigned two police units to investigate. Soon after, a second caller reported hearing approximately seven gunshots in the same area. Five calls in total were received about this incident during the first minute.

A police supervisor, Lieutenant Thomas Nichols, and another patrol unit were dispatched to the location at 12:08 AM. Several more calls were made to the police reporting gunshots, and

---

[1] Unless otherwise noted, all of the information in the "Factual Background" section of this Order originates from testimony at the September 18, 2009 hearing on Defendant's Motion to Suppress (hereinafter "Sept. 18, 2009 Hearing").

more police arrived on the scene. In total, approximately 10 to 15 officers responded to the emergency calls. Upon arriving in the area, Lieutenant Nichols testified that he heard about twenty to twenty-five gunshots from a high caliber firearm. Multiple police officers canvassed the area in an attempt to determine the source of the gunfire, both in patrol cars and on foot. The bulletproof vests the officers were wearing protected them only from small caliber pistols, not the high caliber firearms being used that night. The events took place shortly after midnight, and the area in which the search was conducted had few streetlights. Due to the darkness, and the multiple reports of gunfire, the police could not initially locate the source of the gunfire, and had to spend approximately a half-hour searching the area. Lieutenant Nichols testified to being scared and concerned about his safety as well as the safety of other officers on the scene. It is estimated that at least 50 rounds were fired that night.

At approximately 12:38 AM, the officers were able to identify Defendant's residence as the source of the gunfire. They advised the dispatcher that they heard voices from the back of the residence and they observed a smoldering barbeque. The police officers blocked off the surrounding area and attempted to speak with the Defendant by phone through the police dispatcher, but they were not successful.

While waiting to make contact with Defendant, the officers stood outside the property at issue, which is situated on two acres and surrounded by a fence with an electric gate. The residence was less than 150 yards from a residential subdivision and also nearby Waldron Air Field, a military installation where the Navy performs touch-and-go exercises. The police eventually contacted Defendant's ex-wife, who informed Defendant that the police were attempting to gain entry onto the property.

At 12:48 AM, officers notified the dispatcher that they observed several individuals, including the Defendant, exiting the residence and approaching the front gate. The Defendant and three others were detained at 12:52 AM. Defendant was advised of his <u>Miranda</u> rights at this time, before providing any statement to the police. Defendant's actions constituted a violation of Texas Penal Code § 42.12, which prohibits the "reckless[] discharge[] [of] a firearm inside the corporate limits of a municipality having a population of 100,000 or more," and is a Class A Misdemeanor. Texas Penal Code § 42.12(a), (b).

At approximately 12:56 AM, the police informed the dispatcher that the residence was secure.[2] While at the gate, Defendant informed Lieutenant Nichols that there were several people inside the house. Nichols also assumed that the guns fired that night were still in the residence, as Defendant did not have any firearms when he went to meet the police at the gate. Several officers were then sent in to conduct a protective sweep of the residence to check for injuries and weapons that a person could easily access.

During the protective sweep, the police noticed a gun safe in a closet.[3] Police also found shell casings from three different calibers of firearms, and a .22 rifle leaning against a wall. Many of the shell casings originated from high powered firearms that had a range in excess of one mile. Approximately twelve people were in the house that evening, six of whom were children ranging in age from eight to fifteen. The officers then sat down with Defendant and the others individuals in the dining/living room area of the residence to discuss the night's events.

---

[2] The Court does not use the term "secure" in a legal sense, but rather as it was used by the police officers who testified at the September 18, 2009 hearing, and the emergency dispatch log, Exhibit 1 at the September 18, 2009 suppression hearing. At that point, the shooting had stopped and the officers had detained Defendant. The officers had not yet performed a protective sweep at the time the residence was pronounced "secure."

[3] The gun safe was approximately five feet high, two feet wide, and two feet deep. As the gun safe was large enough for someone to hide in, the police would have been justified in looking in the safe during the protective sweep, but did not do so.

Lieutenant Nichols testified that Defendant freely spoke with the officers once they were sitting inside the residence and had become "very cooperative." The Defendant and others admitted that they had been firing weapons that night. Officer Nichols explained why the officers were at the residence, asked the Defendant where the guns were located, and explained that they wanted to recover the firearms used that night so that they would have the weapons in their custody and be able to further investigate if a round were found in a person or property. Defendant informed the officers that the firearms were in the gun safe. Defendant's son, a fourteen year old minor, then volunteered to take the officers to the gun safe. Defendant was present at this time, and did not object or tell his son not to assist the officers.

Officers Jason Rhodes and Joshua Swain testified that Defendant's son then took them to the gun safe and the son opened the safe door. At no point did Defendant object or instruct his son not to assist the police. The gun safe door was closed, but it was not locked. After the safe door was partially open, the officers then asked the son to step back for safety purposes, and the officers inspected the gun safe. An arsenal of weapons, approximately 15 to 20 guns in total, was found in the safe. Defendant's son pointed out three of the rifles in the safe that had been fired. Officer Rhodes and Officer Saldana then seized these guns and recorded the serial numbers of the other firearms in the safe. According to Lieutenant Nichols, these additional serial numbers were recorded to check for stolen weapons, and to ensure that the police had a record of all of the guns in the residence, in case they had taken the wrong firearms, or it was later discovered that additional firearms had been used that night.

Defendant's witnesses, his son and his friend Josepha Espinosa, both testified that Defendant told the police officers that the firearms were in the gun safe, and did not object when his son volunteered to show the firearms to the officers. Defendant's son did, however, testify

that he was unable to open the gun safe due to difficulty in entering the combination, and one of the police officers had to open it instead.

Once the serial numbers of the guns were recorded, Officer Saldana took the numbers back to the police station. It was then discovered that two of the firearms were stolen, and that information was turned over to the ATF. One of the stolen firearms was fully automatic. ATF agents obtained and executed a federal search warrant at the Defendant's residence on May 13, 2009 and seized the unregistered machine gun listed in the indictment in this criminal action. (D.E. 14.)

## II.     Procedural Background

On September 8, 2009, Defendant filed his Motion to Suppress, seeking to suppress the following: (1) any and all contraband and firearms seized from Defendant's premises on or about March 12, 2009 and March 13, 2009, (2) all results of any laboratory tests and examinations performed upon the seized firearms, (3) any oral or written statements allegedly obtained from Defendant as a result of the search, and (4) any testimony of witnesses whose identity was discovered by the Government as a direct result of the search. (D.E. 19 at 1-2.) Specifically, Defendant contends that the March 13, 2009 search was conducted using a search warrant obtained from facts that were the product of an illegal search. Defendant argues that the police searched the gun safe without his consent, and no circumstances, exigent or otherwise, justified a warrantless search. (D.E. 19-2 at 2.) The United States responded to Defendant's Motion on September 15, 2009. (D.E. 23.) The United States argues that exigent circumstances justified the police's warrantless entry into the home, as does the ability of the police to conduct a "protective sweep" of the premises where there is a danger to public safety. (D.E. 23 at 7-8.) The United States further argues that, once inside the home, Defendant consented to the search

of the gun safe, and the police were then permitted to have recorded the serial numbers on the firearms. (D.E. 23 at 9-14.) The United States also argues that all of the firearms were in plain view once the gun safe was opened. (D.E. 23 at 10, 12.)

As noted above, the Court held a hearing on Defendant's Motion to Suppress on September 18, 2009. At the hearing, the parties argued their various positions and the following persons testified before the Court: Police Dispatcher Cheryl Dobbs, Corpus Christi Police Lieutenant Thomas A. Nichols, Corpus Christi Police Officer Jason Rhodes, Corpus Christi Police Officer Joshua Daniel Swain, ATF Special Agent Brian Garner, Defendant's son, and Defendant's friend Josepha Espinosa. In addition, the parties stipulated as to the testimony of Corpus Christi Police Officer Saldana. At the hearing, the Court orally DENIED Defendant Martinez's Motion to Suppress. (D.E. 19.) The Court now follows with this written Order detailing the reasons for the Court's denial of Defendant's Motion.

## III.   Discussion

As noted above, Defendant seeks to suppress (1) any and all contraband and firearms seized from Defendant's premises on or about March 12, 2009 and March 13, 2009, (2) all results of any laboratory tests and examinations performed upon the seized firearms, (3) any oral or written statements allegedly obtained from Defendant as a result of the search, and (4) any testimony of witnesses whose identity was discovered by the Government as a direct result of the search. (D.E. 19 at 1-2.) As the suppression of these items depends upon whether the initial search of the gun safe and the recording of the serial numbers on the firearms in the gun safe was valid, the Court focuses on this issue.

### A.     Entry onto the Premises was Proper

Although Defendant initially disputed the legality of the police officers' entry onto his property, at the hearing Defendant conceded that the officers' entry onto the property pursuant to exigent circumstances and to conduct a protective sweep was proper.  (Sept. 18, 2009 Hearing at 2:11:58 PM ("we are not contesting the fact that the police officers had probable cause to go out there to the residence. We are not contesting . . . that they had the right to go into the premises, do a protective sweep of the premises to make sure no one was hurt.")).

In any event, the police officers clearly had the right to enter Defendant's residence, both on the basis of exigent circumstances, and to conduct a protective sweep.  Exigent circumstances will justify a warrantless search or seizure where "the safety of law enforcement officers or the general public is threatened."  Tamez v. City of San Marcos, Texas, 118 F.3d 1085, 1095 (5th Cir. 1997) (citing Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 298-99 (1967)).  Exigent circumstances "include those in which officers reasonably fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of evidence."  United States v. Rico, 51 F.3d 495, 501 (5th Cir. 1995) (emphasis added); see generally Tamez, 118 F.3d at 1095 ("The officers had not yet located the gun used to fire the reported shots, nor had they conclusively determined that there were no shooting victims or hostages in the house. Under these circumstances, [the police officer] could reasonably have harbored concern for the lives of innocent people, including [the defendant] himself, or for the lives of [the officer's] fellow officers.  Therefore, . . . the undisputed circumstances of the instant case were sufficiently exigent as a matter of law to justify [the police officer's] brief, warrantless entry into the house.") (emphasis added); U.S. v. Yanez, 490 F. Supp. 2d 765, 771 (S.D. Tex. 2007) ("[The police] faced a fluid, fast-moving situation in which the safety of the public was at

risk as an unknown gunman fired a weapon from an upstairs bedroom. Such a situation presents the paradigmatic instance of exigent circumstances, in which the officers reasonably acted with haste to enter the premises and stop a shooting spree they reasonably believed was endangering neighborhood citizens."). In this case, the firing of numerous rounds from high caliber weapons easily within the range of other residences and a naval airfield clearly demonstrates exigent circumstances. This is a prime example of a situation where "the safety of law enforcement officers [and] the general public [was] threatened." Tamez, 118 F.3d at 1095.

The officers' protective sweep is also authorized in this case. A "protective sweep" is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327 (1990). Officers may perform protective sweeps "of larger areas if they have articulable facts plus rational inferences that allow a reasonable officer to suspect that an individual dangerous to the officers is within the area to be searched." U.S. v. Mata, 517 F.3d 279, 285 (5th Cir. 2008). A protective sweep may be performed even in the absence of an arrest. U.S. v. Gould, 364 F.3d 578, 581 (5th Cir. 2004) ("We turn initially to the primary issue now before us, namely whether there is an across-the-board, hard and fast per se rule that a protective sweep can be valid only if conducted incident to an arrest. We hold there is not."). In this case, the repeated 911 calls concerning numerous shots fired over approximately a half hour, in addition to the twenty to twenty-five rounds the officers heard being fired after they arrived on the scene, clearly allowed the officers to reasonably believe that people were still in the residence, possibly injured, and those in the residence could threaten the area's safety.

The police therefore properly entered Defendant's residence. The only issue is whether the police were justified in searching the gun safe and recording the serial numbers of the guns inside the safe that may not have been fired on the night in question.

### B.  Search of the Gun Safe

#### 1.  Defendant Voluntarily Consented to the Search

A consensual search is a well-established exception to the Fourth Amendment's warrant requirement. Florida v. Jimeno, 500 U.S. 248, 250 (1991). Only free and voluntary consent justifies a warrantless search. United States v. Mendez, 431 F.3d 420, 429 (5th Cir. 2005). Whether consent is "voluntary" is determined by the totality of circumstances, which a court evaluates by considering six factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. United States v. Jones, 234 F.3d 234, 242 (5th Cir. 2000). The "issue of consent is a factual one." United States v. Freeman, 482 F.3d 829, 831-32 (5th Cir. 2007).

In this case, the totality of the circumstances leads to the conclusion that Defendant voluntarily consented to the search.[4] According to Lieutenant Nichols, when the officers spoke with the Defendant after the protective sweep, he was not under arrest at this time and was "very cooperative." Nichols informed Defendant of the importance of recovering the guns used that night. Defendant indicated he understood the officers' need to recover the guns, and upon being asked where the guns were located, he stated that they were in the gun safe. In Defendant's presence, his son then volunteered to take the police to the gun safe, and Defendant did not

---

[4] Because the Court concludes that Defendant voluntarily consented to the search, the Court does not consider whether Defendant's son, a minor, had the authority to consent to a search of the gun safe.

object or otherwise tell his son not to assist the police. The gun safe itself was not locked. Defendant gave no outward signs of not being able to give consent to the search. This testimony was supported by Officers Rhodes and Swain. The Court particularly relies on the testimony of Officers Nichols, Rhodes, and Swain, as they were the only sober adults at the residence on the night in question.

Although the testimony of Defendant's witnesses, his son and his friend Josepha Espinosa, somewhat disputes this account of the events, namely whether the safe was locked, and the nature of the conversation between the officers and Defendant, the Court concludes that these witnesses are not credible. The officers testified that the adults at the residence were intoxicated after drinking for several hours that evening. Moreover, Defendant's witnesses provided the Court with a highly implausible explanation as to the reason for the shooting, namely that Defendant and his friends were shooting at feral hogs that had entered onto the property that night. This explanation is doubtful, as the only light available that night was from a porch light that illuminated only about a third of the backyard. The property did not have floodlights or other illumination that would have enabled someone to see a feral hog on the property at night, particularly if it were at the edge of the property. In fact, defense witness Josepha Espinosa eventually admitted that it was not actually possible to see any hogs that night. Defendant's witnesses lack of credibility as to this point leads the Court to distrust other parts of their testimony.

Overall, Defendant's cooperative demeanor, his identification of the exact location of the firearms, and his failure to object when his son took the police officers to the gun safe demonstrates that Defendant consented to the search. Although "consent may [not] reasonably be implied from [a suspect's] silence or failure to object" unless the officer "expressly or

impliedly ask[ed] for his consent to search," United States v. Jaras, 86 F.3d 383, 390 (5th Cir. 1996), here Lieutenant Nichols impliedly, if not expressly, sought Defendant's consent when he asked Defendant to identify the location of the firearms, and asked if the police could recover them. Defendant's failure to object when his son volunteered to take the police back to the gun safe implies his consent to the search. In addition, the Fifth Circuit has suggested that where, as here, a suspect identifies a gun's exact location, this may on its own lead "officers to reasonably believe in good faith that [the individual] had consented to their entry into the . . . room and their seizure of the gun." U.S. v. Shannon, 21 F.3d 77, 82 n.1 (5th Cir. 1994). At trial, Lieutenant Nichols testified that he interpreted Defendant's identification of the firearms' location as consent to a search of the gun safe. (Sept. 23, 2009 Trial.)

The six factors listed above support the conclusion that Defendant's consent was voluntary. Defendant was not under arrest when the officers sought his permission to search the gun safe;[5] coercive police measures were absent; Defendant had "calmed down" and was "very cooperative" in his discussions with the police; Defendant did not give any outward indications that he lacked the education or intelligence to give voluntary consent; and it does not appear that Defendant thought incriminating evidence might be found. Although Defendant was not informed of his right to refuse to consent, "the failure to advise an individual of the right to withhold consent is not determinative in and of itself" in "determining voluntariness." United States v. Solis, 299 F.3d 420, 437 (5th Cir. 2002). The Court thus concludes that Defendant voluntarily consented to the search of the gun safe.

---

[5] Although Defendant was detained at the time, the Supreme Court has made clear that a lawfully seized defendant need not be "advised that he is 'free to go' before his consent to search will be recognized as voluntary." Ohio v. Robinette, 519 U.S. 33, 35 (1996).

### 2. The Police Properly Recorded the Serial Numbers of the Firearms in the Safe

Any consensual search that is conducted must be within the scope of the consent received, and the "standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Jimeno, 500 U.S. at 251; U.S. v. Zavala, 541 F.3d 562, 576 (5th Cir. 2008) (citing Jimeno). Although "objective reasonableness is a question of law, the factual circumstances are highly relevant when determining what the reasonable person would have believed to be the outer bounds of the consent that was given." U.S. v. Mendoza-Gonzalez, 318 F.3d 663, 667 (5th Cir. 2003).

In this case, the Court concludes that a reasonable person would have understood that the police sought to search the gun safe in its entirety, not only the few guns that Defendant and his son claimed to have fired, particularly after Lieutenant Nichols explained why it was important to recover the guns, and given the numerous rounds fired that night. It is reasonable to conclude that the police would have examined and inventoried all the weapons in the safe to preserve evidence if, for example, it later turned out that other weapons had been fired that night and caused injury to person or property. It is also reasonable to conclude that all of the guns would have to be identified and inventoried, as the police on the scene would not be able to tell with certainty what guns were fired that night.

Once having come into possession of firearms following a consensual search, the police had the right to inventory and record the serial numbers of firearms in the gun safe. The police clearly have the right to identify firearms or other weapons potentially used in the commission of a crime, and one of the easiest ways to identify firearms is by serial number. The Fifth Circuit has recognized that, "[h]aving legally come into possession of [a] gun the police were entitled, if

not expected, to note and to record its serial number." United States v. Wallace, 889 F.2d 580, 583 (5th Cir. 1989), cert. denied 497 U.S. 1006 (1990); see also United States v. Watts, 7 F.3d 122, 127 (8th Cir. 1993) ("Having obtained lawful possession of the firearms, [the police officers] were free to take down the serial numbers. Nor do we see any problem with the officers' using these lawfully-obtained numbers in an attempt to confirm or dispel their suspicions of criminal behavior.") (citing Wallace). The police officers' actions in this case were consistent with those authorized by the Fifth Circuit.

Moreover, in the circumstances of this case, the police would likely have been justified in not just recording the serial numbers of the other weapons in the residence, but seizing all of the weapons that night. As noted above, the officers on the scene identified some of the shell casings as originating from high powered firearms with a range that could exceed one mile. The firearms Defendant admitted to firing that night could easily have injured others in the nearby residences or Waldron Field. Defendant and the other adults in the household appeared intoxicated at the time, and it would have been reasonable to assume that they may have continued their activities with the other weapons in the gun safe after the police left the residence. Furthermore, there were six young children in the residence that night as well, any of whom could have been injured or killed by errant gunfire. Given these circumstances, the physical seizure of the firearms used that night and the constructive seizure of others, through the notation of serial numbers, is completely justified to protect those in the household and the community at large from further indiscriminate and dangerous behavior. Other courts have similarly recognized the right of the police to seize firearms when necessary to protect the public safety. See, e.g., Yanez, 490 F. Supp. 2d. at 780 (S.D. Tex. 2007) (upholding warrantless seizure of a shotgun following arrest of certain individuals who had fired guns inside a house, explaining

it "was necessary under the circumstances to find any hidden accomplices and seize the weapons they could have used to reinitiate further threats against police and public safety."); see also Mora v. City of Gaithersburg, MD, 519 F.3d 216, 227 (4th Cir. 2008) (upholding warrantless seizure of firearms after individual made threatening statements, even though defendant was no longer on the premises, and explaining, "th[e] public safety rationale was a sound basis for seizing Mora's weapons, whether or not they were contraband or evidence, for the authority to defuse the threat Mora presented comprehended the authority to take the weapons that made him so threatening. There are no shortage of precedents approving preventive seizures for the sake of public safety."). Recording the serial numbers of the firearms in Defendant's gun safe was indeed the least the officers were expected to do in this situation.

In sum, the police had Defendant's permission to conduct a search of the gun safe in its entirety. While conducting the search, the police had the authority to record the serial numbers of all guns in the safe, not just to seize those guns that Defendant claims were fired. The federal warrant obtained as a result of this search is therefore valid, as is all other evidence obtained as a result of the search.[6]

## IV. Conclusion

For the reasons set forth above, Defendant's Motion to Suppress (D.E. 19), seeking to suppress (1) any and all contraband and firearms seized from Defendant's premises on or about

---

[6] The Court also notes that the officer's actions may be justified on the basis of the plain view doctrine. Certain conditions must be satisfied before a plain view seizure is upheld: "(1) the officer conducting the seizure must lawfully arrive at the position from which the object is plainly seen; (2) the object must be in plain view; (3) the object's incriminating character must be immediately apparent- i.e., the officer must have probable cause to believe the object is contraband or evidence of a crime; and (4) the officer must have a lawful right of access to the object itself." U.S. v. Paige, 136 F.3d 1012, 1023 (5th Cir. 1998). The Fifth Circuit has upheld the seizure of firearms found in plain view after an individual consents to a search of his premises. U.S. v. Santiago, 410 F.3d 193, 201 (5th Cir. 2005). Here, even if the Court were to conclude that Defendant consented only to the search of the gun safe for the limited purpose of seizing those firearms that he claims were used that night, the plain view doctrine would justify seizure of the fifteen to twenty other guns in the safe, as they were in plain view once the safe was open, their incriminating character was immediately apparent given defendant's actions, and the police had a lawful right to be in the place where the guns were located.

March 12, 2009 and March 13, 2009, (2) all results of any laboratory tests and examinations performed upon the seized firearms, (3) any oral or written statements allegedly obtained from Defendant as a result of the search, and (4) any testimony of witnesses whose identity was discovered by the Government as a direct result of the search, is hereby DENIED.

SIGNED and ORDERED this 25th day of September, 2009.

                                                                                 Janis Graham Jack
                                                                   United States District Judge